# IN THE COURT OF APPEALS OF IOWA

No. 15-1438
Filed September 14, 2016

STATE OF IOWA,
        Plaintiff-Appellee,

vs.

CHARLES FREDERICK FEURING,
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Madison County, Gary G. Kimes,

Judge.



        Charles Feuring appeals his third-degree-sexual-abuse conviction.

**AFFIRMED.**



        Mark C. Smith, State Appellate Defender, and Maria Ruhtenberg,

Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, Kyle Hanson, Assistant Attorney

General, for appellee.



        Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

Charles Feuring appeals his conviction for third-degree sexual abuse. He challenges the jury instruction defining the "by force or against the will of" element of third-degree sexual abuse, arguing the instruction was unconstitutionally overbroad and vague. He further claims there is insufficient evidence to support his conviction. Because the trial court properly instructed the jury and sufficient evidence supports Feuring's conviction, we affirm.

### I. Background Facts and Proceedings.

Feuring, who is seventy-four years old, had been acquainted with YY[1] since she was a young child. When YY was approximately fourteen years old, Feuring began making comments that made her uncomfortable. YY testified, "He would tell me how I appealed to him, tell me how beautiful I was. He would ask me if I had a boyfriend. He would tell me that he would always take care of me, that—You know, stuff like that." When YY was fourteen or fifteen years old, Feuring began asking her if she was sexually active. YY felt increasingly uncomfortable with Feuring's behavior as she reached the age of sixteen, explaining:

> He would make comments. He one time made a comment about how nice my butt looked. He would always try to be near me, close to me, hold me. I mean, he would make comments, you know, oh, you'd be so nice to kiss. You know, about the boyfriend, asked if I had a relationship.

---

[1] Iowa Rule of Civil Procedure 1.422(2) allows a party to omit or redact information concerning crime victims and the names of minor children from documents filed with the court unless the information is material to the proceedings. In the trial information and other documents filed with the district court, the parties replaced the name of the complaining witness, a minor child, with the pseudonym "YY." Iowa Rule of Court 21.25 requires this court to refer to parties "by first name, initials, or pseudonym" in certain instances. Although not required here, we will continue to refer to the complaining witness as YY throughout this opinion.

Feuring also asked YY if she would ever have sex with him. When YY said no, Feuring told her that if she "ever changed [her] mind, that he would take care of [her], that it would be [their] secret."

In April 2014, Feuring kissed YY, who was then sixteen years old. Feuring provided beer for YY to drink. YY explained at trial how Feuring's temper and her fear of upsetting him influenced how she reacted to the kiss: "I wanted to push away but I couldn't. I just let him do it. I wanted to push away but I wasn't sure if that was the correct move." Afterward, YY asked to go home, but Feuring continued talking to her about sex, described the sex acts he wanted to perform with her, and tried to remove her clothes. When YY expressed discomfort, Feuring said, "[W]e won't go all the way tonight." YY told Feuring, "I don't see [you] that way. I don't look at [you] as a sexual figure." Feuring told YY, "[T]hat's understandable that you don't see me that way but I just want you to know that I see you that way and that I would love you and take care of you." He also suggested renting a motel room so they could have sex in a more comfortable environment, but YY told him "no," and Feuring responded that they would talk about it "the next time."

One week later, Feuring gave YY alcoholic beverages and kissed her again. Fearing that Feuring would be upset and would force himself on her if he was rejected, YY did not attempt to stop him. YY testified "[she] told him that [she] didn't want to do anything, that [she] just wanted to go home and that [she] was tired," and Feuring took her home.

Later that night, Feuring invited YY to go hunting with him. YY initially feigned sickness and declined, but she eventually relented and agreed to a short hunt that night. Before beginning to hunt, Feuring again gave YY alcoholic beverages and tried to kiss her. After the hunt, Feuring asked YY to have sex with him, and she told him "no." Feuring then gave YY another alcoholic beverage, which YY accepted because "[she] figured that if [she] drank enough that [she would]n't remember any of it." When Feuring reminded YY they could have sex and keep it a secret, she told him, "I don't look at [you] that way" and "I want[] to go back home."

Rather than returning home, Feuring kissed YY again, removed her pants, and put his penis in her vagina. Feuring did not wear a condom because, as he told YY, he had undergone a vasectomy. YY testified that she considered fighting Feuring off but she was too impaired at that point to drive the truck, unsure of her whereabouts, and fearful that Feuring would come after her. However, YY believed she had made it clear that she did not want to have sex with Feuring, testifying: "I told him no, I didn't see him that way, I didn't want to have sex." YY testified that during the act, she lay there, unmoving and looking up at the "ceiling" of Feuring's truck. Although Feuring used his tongue while kissing, YY did not use her tongue back. She tried to turn her head away from Feuring, but he would turn it back and kiss her again. YY cried during the act, but Feuring commented, "You like it. You're smiling."

Fearful of the possible repercussions, YY did not tell anyone what happened for two days. After reporting what occurred, YY was taken to the hospital for a medical examination, which revealed she had an abrasion where

the top layer of skin had rubbed off at the opening of her vagina at the "six o'clock position." The nurse that examined YY testified the abrasion was indicative of "some kind of forced penetration into her vagina because it causes a rubbing," explaining that "we have a natural lubrication when we get sexually excited that helps lubricate the area" and "[y]ou don't normally get an abrasion like that unless the area is dry and there is a friction that causes that." She further testified that the abrasion at the six o'clock position indicated a forced sexual encounter because women who are sexually assaulted "are usually on their back and [the penis] is being forced down into [the vagina]."

DNA testing was performed on the clothes YY wore on the night in question. A stain in YY's underwear tested positive for semen without spermatozoa present, which was consistent with the contributor of the semen having had a vasectomy. Multiple stains on YY's jeans contained semen without spermatozoa but also contained epithelial cells from someone other than YY. Testing of the epithelial cells from one of the weaker stains was consistent with a DNA sample obtained from Feuring, with the probability of finding that DNA profile in a population of unrelated individuals chosen at random being one out of eighty-five thousand. Testing of the epithelial cells found in two other stains matched the DNA sample obtained from Feuring, with the probability of finding that DNA profile in a population of unrelated individuals chosen at random being less than one out of one-hundred billion. The State's expert testified the stains were consistent with sexual intercourse.

The State charged Feuring with first-degree kidnapping for "kidnapping and intentionally subjecting YY to sexual abuse" and third-degree sexual abuse

for "sexually abus[ing] YY by performing a sex act against YY's will or by force."

Following a June 2015 jury trial, Feuring was found not guilty of kidnapping but guilty of sexual abuse. Feuring appeals.

### II. Jury Instruction.

Feuring first contends the court erred in instructing the jury on one of the elements the State was required to prove to obtain a conviction. Our review is for correction of errors at law. *See State v. Hoyman*, 863 N.W.2d 1, 7 (Iowa 2015). "However, when a defendant is alleging error involving a constitutional right, we make an independent evaluation of the totality of the relevant circumstances to determine if such an error was made." *State v. Bennett*, 503 N.W.2d 42, 45 (Iowa Ct. App. 1993).

To find Feuring guilty of third-degree sexual abuse, the jury was instructed the State had to prove that Feuring performed a sex act "by force or against the will of" YY when they were not living together as husband and wife. Instruction No. 23 explained the State was required to prove Feuring committed a sex act "by force or against the will of" YY:

> [T]he State must prove that [Feuring] committed a sex act "by force or against the will" of [YY]. In order to do so, however, the State does not have to prove that [YY] physically resisted [Feuring]'s acts. The force used by [Feuring] does not have to be physical. It may consist of threats of violence against the victim or another person which overcame [YY]'s will by fear.
> You may consider all of the circumstances surrounding [Feuring]'s act in deciding whether the act was done by force or against the will of [YY].

Feuring claims Instruction No. 23 does not accurately state the law. He argues the court should have instead given his proposed instruction on the element, which adds one sentence to the language of Instruction No.

23: "[Feuring] knew or should have known it was against her will." However, Iowa law does not require proof the defendant knew or should have known the sex act was done by force or against the will of another; it requires only that the sex act "is done by force or against the will of the other." *See* Iowa Code § 709.1(1) (defining sexual abuse), .4(1) (setting forth the elements of third-degree sexual abuse) (2013). The plain language of the statute does not require more. Because the instruction Feuring proposed did not accurately state the law, the district court properly declined to instruct the jury as Feuring requested. *See State v. Hanes*, 790 N.W.2d 545, 548 (Iowa 2010) ("Our review is to determine whether the challenged instruction accurately states the law . . . .").

Feuring alleges that without requiring proof a defendant knew or should have known the other person did not consent, the "against the will of" language is unconstitutionally vague and overbroad. We disagree. A statute is unconstitutionally overbroad if it infringes upon protected freedoms, and the overbreadth analysis is limited to alleged denials of First Amendment rights. *See State v. Armstrong*, 787 N.W.2d 472, 477 (Iowa Ct. App. 2010). Feuring does not make any claim regarding a violation of his First Amendment rights, and therefore, his claim is waived. *See id.* at 477-78. A statute is unconstitutionally vague if it fails to "define the criminal offense with 'sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* at 478 (quoting *State v. Millsap*, 704 N.W.2d 426, 436 (Iowa 2005)). The statutory language is clear and unambiguous in that it applies to a defendant that commits

a sex act against another person's will. The conduct being criminalized is specific and defined in a way that citizens of this state can understand.

Feuring attacks the constitutionality of our sexual-abuse statute as vague as applied, arguing that by allowing a conviction without proof that a defendant knew or should have known the act was done against the will of the other person, the statute requires the defendant to "imagine what is in the mind of the person he is having sex with in order to determine if he or she 'really wants to.'" Our supreme court rejected a similar argument in *State v. Sullivan*, when it held the provision of section 709.4 that protects "those who are so mentally incompetent or incapacitated as to be unable to understand the nature and consequences of the sex act" was not unconstitutionally vague. 298 N.W.2d 267, 272-73 (Iowa 1980).

> We are unimpressed by defendant's arguments that the statute is rendered vague by its requirement that the alleged violator determine another's mental capacity. The potential offender must simply determine if his or her partner understands the nature and consequences of engaging in the sex act. Under normal circumstances a mental incapacity to consent would be apparent in ordinary social intercourse. The potential offender who would engage in sex acts with a stranger may be required to ask questions to be "safe," just as he or she would be required to do in order to ascertain the other's chronological age to avoid prosecution under subsection 709.4[(1)(b)(1)].[2]
>
> The fact an erroneous judgment by an offender may still subject him or her to criminal sanction if the partner in fact does not possess the requisite mental capacity does not make the statute unconstitutional. This crime does not require knowledge or

---

[2] Feuring's argument involves the concern—real or imagined—that a defendant can be convicted of sexual abuse by engaging in a sex act that, by outward appearances, seems to be consensual with a partner who secretly withholds consent. The solution offered by our supreme court in *Sullivan* more than thirty-five years ago to those concerned with being prosecuted for sexual abuse by engaging in a sex act with a person "suffering from a mental defect or incapacity" is just as relevant and applicable to those concerned with being prosecuted for engaging in a sex act "against the will of" another today: the concern may be alleviated simply by asking a question.

> intent. . . . We hold the standard imposed by subsection 709.4[(1)(b)(1)] is clear: To avoid the proscribed conduct one must refrain from performing a sex act with a person who is mentally incapable of understanding the nature and possible consequences of sexual activity.

*Id.* We likewise reject Feuring's vagueness challenge.

### III. Sufficiency of the Evidence.

Feuring also argues there is insufficient evidence to support the verdict. He claims the State failed to prove he acted against YY's will. We review this claim for correction of legal error and will uphold the jury's verdict if it is supported by substantial evidence. *See State v. Heard*, 636 N.W.2d 227, 229 (Iowa 2001). Evidence is substantial if it would convince a rational finder of fact that the defendant is guilty beyond a reasonable doubt. *See id.* In making this determination, we view the evidence in the light most favorable to the State and draw all fair legitimate inferences and presumptions in the State's favor. *See id.*

The uncontroverted evidence shows YY never stated her consent to have sex with Feuring. Rather, YY testified that whenever Feuring asked if she wanted to have sex with him, she answered "no." Feuring ignored her direct statements and viewed the surrounding circumstances as consent. He assumed her actions—or more accurately, her inaction in failing to tell him "no" again or fight him off when he persisted in his attempts to have sex with her—amounted to consent. After viewing the evidence, the jury reached the opposite conclusion.

Substantial evidence supports a finding Feuring had sex with YY against her will. YY testified she did not consent to sex with Feuring. Although Feuring's counsel attempted to discredit this claim, it was for the jury to determine whether YY's testimony was credible. *See State v. Morgan*, 877 N.W.2d 133, 138-39

(Iowa Ct. App. 2016) (noting it is the "very function of the jury" to determine witness credibility and the jury is free to believe or disbelieve any testimony as it chooses); *see also State v. Voelpel*, 226 N.W. 770, 771 (Iowa 1929) (stating that when a defendant attempts to impeach a witness's testimony, "it is for the jury to determine, from all the facts and circumstances, the credibility that shall be given to the witness"). YY's description of the circumstances surrounding the sex act supported her claim the act was against her will. For instance, YY testified that she did not actively participate in the act, instead lying still and looking up at the roof of the truck while crying. She also testified that rather than reciprocating when Feuring kissed her using his tongue, she did not kiss him back with her tongue and tried to turn her head away. Finally, physical evidence corroborates YY's testimony and indicates Feuring acted against YY's will; the medical examination revealed an abrasion at the opening of YY's vagina, which was consistent with forced penetration.

Having determined the trial court properly instructed the jury as to the definition of the "by force or against the will of" element of third-degree sexual abuse and substantial evidence supports the finding Feuring acted against the will of YY, we affirm.

**AFFIRMED.**